NOT FOR PUBLICATION

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re:<br><br>PATSY CATANZARETI,<br><br>                Debtor.<br><br>PATSY CATANZARETI,<br><br>                Plaintiff/Appellee,<br><br>    v.<br><br>KENNETH S. PIZZO, SR.,<br><br>                Defendant/Appellant. | Civil Action No. 09-2666 (GEB)<br><br>**MEMORANDUM OPINION** |

**BROWN, Chief Judge**

      This matter comes before the Court upon an appeal of Kenneth S. Pizzo, Sr., ("Defendant" or "Appellant"), from the April 8, 2009 Order of the United States Bankruptcy Court for the District of New Jersey ("Bankruptcy Court"). *In re Catanzareti*, 400 B.R. 145 (Bankr. N.J. 2009). The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 158. The Court has considered the parties' submissions and decided the matter without oral argument pursuant to Federal Rule of Civil Procedure 78. For the reasons that follow, the Court will affirm the decision of the Bankruptcy Court.

**I.     BACKGROUND**

The Bankruptcy Court made extensive findings of fact over the course of a five (5) day trial and produced a thirty four (34) page opinion. *In re Catanzareti*, 400 B.R. 145 (Bankr. N.J. 2009). The pertinent facts are summarized here.

This case is the result of an attempted sale and eventual condemnation of an 86 acre piece of land located in the Borough of High Bridge, New Jersey. *Catanzareti*, 400 B.R. at 149. Plaintiff-Debtor Pat Catanzareti ("Catanzareti" or "Appellee") bought the property to develop it into residences, a plan which was vigorously opposed by the municipality. *Id.* In 1995, Catanzareti and Kenneth S. Pizzo, Sr. ("Pizzo" or "Appellant") signed a contract for the sale of the land, pending governmental approvals of the subdivision plan. *Id.* at 150. That contract provided for a three year deadline for obtaining approvals with a two year extension if an application of litigation was pending. *Id.* at 151. After five years either party could terminate the contract. In 2000, at the end of the five year deadline, Catanzareti was engaged in litigation with the Borough in state court. *Id.* That action was settled, and Pizzo and Catanzareti signed an amended contract on January 9, 2003. This 2003 contract largely tracked the 1995 contract, with 4 important changes:

> (1) The price per lot was increased to $50,000 for each lot that received approval, but a separate formula was used in the event the plans that had already been submitted were approved. If these submitted plans were "deemed approved" the total purchase price would be $4,635,000;
> (2) The amount Pizzo agreed to advance, interest free, to pay development costs including engineering and legal fees was increased from $450,000 to $750,000;
> (3) The time period to obtain approval was four years, but could be extended indefinitely if applications for governmental approval or litigation affecting the development were pending; and
> (4) If fewer than 70 lots received approval, Pizzo had the option to buy the property at a fixed price of $3.5 million.

*Id.* at 152. Paragraph 1.1.2 provides the exact language that gives rise to the fourth change from

the 1995 contract:

> **1.1.2** Buyer and Seller agree that Buyer's obligation to close hereunder shall be contingent upon the receipt of final subdivision approval for at least 70 Lots of the size of the Basic Lots. If fewer than 70 Basic Lots receive final subdivision approval, Buyer shall have the right, at his sole discretion, to terminate this Agreement and the Deposit shall be returned to Buyer in accordance with paragraph 1.2.1 hereof. <u>If fewer than 70 Basic Lots receive final subdivision approval, but Buyer elects to proceed with Closing, Buyer agrees to pay the Purchase Price of $3,500,000</u> (as if 70 Basic Lots had been approved), but, if applicable, subject to the per square foot reduction provided for in the last sentence of paragraph 1.1.1 hereof.

(emphasis added). The 2003 contract also contained a condemnation clause, which provided that the Buyer (Pizzo) had the right to terminate the contract if a the Borough commenced a condemnation proceeding. *Id.* The condemnation clause further provided that any proceeds from a condemnation would be property of the Seller (Catanzareti). *Id.*

At the beginning of the development process, condemnation was not seen as a viable option because the piece of land was too expensive for the Borough to afford. *Id.* at 153. On September 8, 2005, the Borough passed an ordinance to appraise the property and condemn it "if the borough can fund the purchase." A bond ordinance dated 7 months later appropriated $979,000 to acquire the property through condemnation, far short of the approximately $8 million appraised value. *Id.* At this time, Pizzo was unaware that the Borough had taken any steps towards condemning the property. *Id.*

In the Fall of 2006, the local paper stated that the property had been appraised, which gave Pizzo notice that the Borough was moving further towards a condemnation proceeding than had been originally anticipated. Pizzo embarked on an "all-out effort to convince the town not to condemn the property." *Catanzareti*, 400 B.R. at 154. Pizzo also attempted to move forward

with purchasing the property. *Id.* at 155.  On February 14, 2007, Pizzo's lawyer wrote to Catanzareti and his lawyer that Pizzo "will waive all of the preconditions except title and therefore is prepared to settle on the 6th day of March, 2007." *Id.*  He also asserted that Pizzo had been damaged by Catanzareti's lack of diligence.  *Id.*  Catanzareti's lawyer responded on February 22, 2007, writing:

> Mr. Catanzareti is willing to give consideration to Mr. Pizzo's proposal to close title promptly, but your letter does not clarify important terms concerning such a closing.  Would you please confirm that your letter intends a closing of title at which:
> 1. General releases would be exchanged between the parties; and
> 2. The purchase price would be $5,200,000.00 (104 marketable lots x $50,000), subject only to normal adjustments for back taxes.
>
> If you confirm these details, Mr. Catanzareti will respond to Mr. Pizzo's offer promptly.

Pizzo's lawyer responded on March 1, 2007:

> The approval contingencies as to the sub division is for the benefit of the buyer, the buyer clearly has a right to waive said contingencies.  Furthermore the base price and anything more than that is contingent upon a "final major sub-division approval for not less than 70 lots plus the Mount Laurel Land" etc., etc. (SEE PARA 5.1 on pages 7 & 8 in the contract of sale).  Clearly there are no finally approved lots and no map has been filed.  Clearly the actual development of the property may be very far away.

Catanzareti's lawyer wrote back on March 9, 2007:

> Mr. Catanzareti and I are simply bewildered by the content of your March 1, 2007 letter.  You had previously written indicating that Mr. Pizzo wished to close title immediately, and was waiving all preconditions to closing.  I responded by letter to you dated February 22, 2007 seeking to clarify two points which are fundamental to a possible closing.  Your March 1st letter did not respond to either of my questions, so I will repeat them:
> 1. Is your client prepared to exchange general releases at the

> closing?
> 2. Is the purchase price to be $5,200,000.00 (104 marketable lots x $50,000)?

On March 14, 2007, Pizzo's lawyer wrote back:

> In response to your March 9, 2007 letter, I will respond to your questions in seiatim as follows:
> 1. My client will exchange mutual releases.
> 2. My client's position is clear and that is at this point there are no approvals and under the Agreement of Sale he has the right to close in accordance with that Agreement in the amount of $3,500,000.00.

Shortly thereafter, Pizzo filed a complaint for specific performance in state court on March 26, 2007. The remedy of specific performance became moot once the Borough took title. Catanzareti filed a voluntary petition under Chapter 11 of the Bankruptcy code on January 27, 2008.

The Bankruptcy Court held that Catanzareti was not obligated to close before completion of the approval process, that Pizzo's demand was not effective to give rise to a breach, and further that the price of $3.5 million was not correct. *Catanzareti*, 400 B.R. at 158. The Bankruptcy Court further held that Catanzareti did not breach his duty to Pizzo under the contract by failing to notify Pizzo of any "proceeding or action" for condemnation. *Id.* at 165. The court held that Catanzareti was obligated to give Pizzo notice only if a formal proceeding or action was initiated under the Eminent Domain Act. *Id.* Therefore, Pizzo's claims to the condemnation funds as an unsecured creditor were denied. *Id.* at 167. On May 4, 2009, Appellant Pizzo filed a notice of appeal from the Bankruptcy Court's March 6, 2009 opinion and April 8, 2009 Order.

**II.   DISCUSSION**

    **A.   Standard of Review**

Bankruptcy Rule 8013 provides that the district court "may affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree or remand with instructions for further proceedings. Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous . . . ." FED. R. BANKR. P. 8013.  A factual finding is clearly erroneous only where "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *In re Cellnet Data Sys., Inc.*, 327 F.3d 242, 244 (3d Cir. 2003) (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948)).  A Bankruptcy Court's conclusions of law, on the other hand, are reviewed de novo. *Id.* Where mixed questions of law and fact are presented, the Court "afford[s] a clearly erroneous standard to integral facts, but excercis[es] plenary review of the lower court's interpretation and application of those facts to legal precepts." *Schlumberger Res. Mgmt. Servs. v. CellNet Data Sys.* (*In re CellNet Data Systems, Inc.*), 327 F.3d 242, (3d Cir. 2003) (citing *In re Top Grade Sausage, Inc.*, 227 F.3d 123, 125 (3d Cir. 2000)).

When construction of a contract is the issue before the appellate court, the question is one of law and is freely reviewable. *Wiltshire v. Gov't of Virgin Islands*, 893 F.2d 629, 633 (3d Cir. 1990).  Contract interpretation, i.e., determining the intent of the parties under a contract, is reviewable on a clearly erroneous basis. *Henkels & McCoy, Inc. v. Adochio*, 138 F.3d 491, 496 (3d Cir. 1998).  There is a difference between contract construction and contract interpretation: construction of a contract determines its legal operation, whereas a court engaged in contract interpretation simply construes ambiguous terms. *See Garden State Tanning, Inc. v. Mitchell Mfg. Group, Inc.*, 273 F.3d 332, 335 (3d Cir. 2001).  "[C]onstruction of a contract begins with the interpretation of its language but does not end with it, while the process of interpretation

6

stops wholly short of a determination of the legal relations of the parties." 5-24 CORBIN ON CONTRACTS § 24.3. In determining the legal effect an agreement will have on an event the parties did not foresee, the process is construction, not interpretation. *Ram Constr. Co. v. American States Ins. Co.*, 749 F.2d 1049, 1053 (3d Cir. 1984) (internal citation omitted). "Construction, which may be usefully distinguished from interpretation, is a process by which legal consequences are made to follow from the terms of the contract and its more or less immediate context, and from a legal policy or policies that are applicable to the situation." Patterson, *The Interpretation and Construction of Contracts*, 64 COLUM. L. REV. 833, 835 (1964). Here, because the Bankruptcy Court did more than merely interpret the terms of the contract, it engaged in contract construction that is subject to plenary review.

      **B.**    **Application**

           *1.*    *Did the Bankruptcy Court erroneously rule that Pizzo was not entitled to close on the property?*

The Bankruptcy Court ruled that Pizzo was not entitled to close on the property for three reasons: (1) that Pizzo had no right to close until the completion of the approval process; (2) the price term of $3.5 million was incorrect; and (3) the February 14 letter did not make a valid "time of the essence" demand. These three conclusions will be addressed in turn.

           *a.*    *Did Pizzo Have a Right to Waive Preconditions to Closing and Proceed to Closing?*

Appellant Pizzo claims that the Bankruptcy Court erroneously ruled that Pizzo did not have a right to waive the preconditions to closing and close for $3.5 million prior to development

approval. (Appellant's Br. at 18). The Bankruptcy Court ruled that Pizzo was not entitled to close on the property unless Catanzareti completed the approval process with the Borough of High Bridge. *Catanzareti*, 400 B.R. at 158-9. The Court held that Pizzo's option to buy fewer than 70 lots for a price of $3.5 million was only vested when the approval process and all litigation had been completed, and the end result was fewer than 70 lots received final approval. *Id.* at 159. Appellant argues that paragraph 5 of the contract, which provided that the preconditions to closing were solely for the benefit of the buyer, expressly allowed Pizzo to waive any of the preconditions and proceed to closing at any time. The Bankruptcy Court did not agree.

"In New Jersey, contract construction is directed at discovering the object of intent of the parties manifested in the terms of the agreement, not the undisclosed, subjective intent of one party or another." *Air Master Sales Co. v. Northbridge Park Co-Op, Inc.*, 748 F. Supp. 1110, 1115 (D.N.J. 1990). The Bankruptcy Court found that the intent of both parties was to create a situation where, if fewer than 70 lots had received final approval, Pizzo still had the option to close for a price of $3.5 million. *Catanzareti*, 400 B.R. at 159. To hold that paragraph 5 of the contract would allow Pizzo to waive the approval contingency in its entirety and close on the property immediately would be counter to the Bankruptcy Court's finding that the intent of the parties was to complete the approval process and obtain approval for as many lots as possible. *Catanzareti*, 400 B.R. at 158.

Paragraph 5 states that the Buyer "shall have the right to waive any or all of [the conditions stated herein] in whole or in part." One of the stated conditions is "Governmental Approvals." Pizzo argues that this expressly gave him the right to waive the governmental

approval process and proceed to closing. (Appellant's Br. at 18). This provision of the contract, if valid, would allow Pizzo to wait for Catanzareti to "expend all the time and expense to obtain the maximum number of lots (and the highest price) and then, just before the last approval document was signed, to waive the approvals contingency and acquire title for the minimum price of $3.5 million." *Catanzareti*, 400 B.R. at 159. Pizzo testified that the contract would allow him to do so, but that he would not exercise that option because it would not be morally or ethically right, or it might breach a duty of good faith and fair dealings. *Id.*

The Bankruptcy Court found that the implied covenant of good faith and fair dealing made paragraph 5 of the 2003 Agreement, which gave Pizzo the express right to waive all preconditions to closing, irrelevant. Appellant contends that this was reversible error because "[t]he implied covenant of good faith and fair dealing may not override an expressly granted right under the contract." (Appellant's Br. at 20 (citing *Sons of Thunder, Inc. v. Borden, Inc.*, 148 N.J. 396, 419 (1997))). However, this case is distinguishable. *Sons of Thunder* only noted that implied covenants cannot override express *termination* clauses. *Sons of Thunder*, 148 N.J. at 419 ("We agree with the majority's view that the implied covenant of good faith and fair dealing cannot override an express termination clause.") This Court is not prepared to extend that proposition to the current factual situation, where a party to a contract is seeking to accelerate the completion of the contract, not terminate it. The Court affirms the Bankruptcy Court's holding that, in light of the entirety of the 2003 contract, the situation of the parties, the attendant circumstances, and the objects the parties were thereby striving to obtain, the Appellant was not entitled to close on the Property until the completion of the approval process with the Borough. While Appellant attempts to characterize the disposition of the Bankruptcy Court as creating an

9

"unwarranted windfall profit to the seller," it is actually Appellant who would obtain the windfall profit if the Court were to hold that he is entitled to the condemnation award.

### b.     Was the $3.5 Million Price Term Operative?

The Bankruptcy Court also held that the two sections of the contract that refer to the $3.5 million closing price could not have applied on Pizzo's proposed closing date (March 6, 2007). *Id.* at 162.  Appellant argues that the Bankruptcy Court, in deeming applicable the $4,635,000 purchase price under paragraph 20.8 of the Agreement, "misread" such provisions.  (Appellant's Br. at 22).  According to Appellant, "at least one of the three predicate conditions [in paragraph 20.8] must exist to trigger the $4,635,000 replacement pricing provision." (*Id.* at 23).  Paragraph 20.8 of the 2003 Agreement provides as follows:

> **20.8** If (a) no final settlement of the Litigation[1] is reached among the parties hereto and the Borough, or (b) a judgment in the Litigation consistent with the provisions of either paragraph 20.2 or the provisions paragraphs 1.1.1 *et. seq.* set forth below is not obtained, or (c) the Litigation is dismissed or otherwise not pursued and an application consistent with the provisions of paragraph 20.2 or replacement paragraphs 1.1.1 *et. seq.* below is not approved as to above, after the 4 years from the date of execution of this Agreement (as it may be extended pursuant to paragraph 5.6 hereof) provided for in this Agreement, either of Buyer or Seller shall have the right to terminate this Agreement, the Advance shall be returned to Buyer as provided herein unless Buyer determines, in its sole discretion to purchase the property for $3,500,000.00 in spite of the failure of any of the events in subparagraphs a-c to occur within the time set forth in this paragraph.  Furthermore, if Seller prevails in the Litigation with the Township so that Seller's plans and other submissions that are the subject matter of the Litigation (the "Submitted Plans") are

---

[1] The 2003 Agreement in the preambles defined "Litigation" as the perogative writ litigation between Catanzareti and High Bridge in the New Jersey Superior Court.  The Bankruptcy Court found that Catanzareti prevailed in the Litigation.  *Catanzareti*, 400 B.R. at 162.

>   deemed approved, then the provisions of paragraphs 1.1.1, 1.1.2, 1.1.3, and 1.1.4 hereof, shall be replaced in their entirety with the following . . . .

The Bankruptcy Court found that "the first part of paragraph 20.8 attempts to list the possible ways the Litigation might have ended unsuccessfully for Catanzareti." *Catanzareti*, 400 B.R. at 161.   The court concluded that subpart (b) of paragraph 20.8 was effective as of March 6, 2007, meaning that the original paragraphs 1.1.1 through 1.1.4 were replaced by the new 1.1.1 through 1.1.5, which provide for the higher purchase price of $4,635,000. *Id.* at 162.  If Catanzareti failed in the Litigation, defined as failure to obtain (a) an acceptable settlement, (b) satisfactory judgment, or (c) dismissal, as well as failure to obtain subdivision approval, then Appellant could purchase the property for $3.5 million.  If Catanzareti prevailed in the Litigation and if the subdivision plans at issue in the Litigation were "deemed approved," then Appellant could purchase the Property for $4,635,000.

   The Bankruptcy Court found that Catanzareti prevailed in the Litigation and obtained approval of the preliminary subdivision and site plan, triggering the replacement provisions that contain the higher purchase price.  *Id.*  Appellant argues that the Bankruptcy Court's construction of the contract was incorrect due to the presence of an extra "not" in subparagraph (b), and further that the submitted plans "were not unconditionally deemed approved." (Appellant's Br. at 23).  The Court concludes that the Bankruptcy Court's construction of the contract, ruling that subpart (b) of the contract was applicable because Catanzareti prevailed in the litigation, was proper given the context of subpart (b) within the text.

   Appellant also argues that there was no "deemed approval" of the submitted plans

because the approvals were subject to "multiple conditions." (*Id.* at 23). The Bankruptcy Court found that the number, size, and configuration of the lots would remain unchanged after final subdivision and site plan approval. *Catanzareti*, 400 B.R. at 161-63. "The maximum relief Catanzareti could seek in the Litigation was preliminary approval. He got that." *Id.* at 161. The state court remanded the issue to the Planning Board for final review and approval subject to certain minor conditions requested by the court-appointed special master, but the state court ordered the Borough to "cooperate fully" with Catanzareti, instituted strict timelines for any deliberations, and directed the special master to oversee the Borough's compliance with its order. *Catanzareti v. Borough of High Bridge*, Dkt. No. HNT-L-636-98, (N.J. Super. Ct. Law Div. filed Nov. 15, 2004) (Appx. at 1175). This Court affirms the Bankruptcy Court's holding that the submitted plans were deemed approved for the purposes of paragraph 20.8.

                                                      *c.*      *Was the Demand to Close Invalid for Failure to Make "Time of the Essence?"*

The Bankruptcy Court also concluded that Catanzareti did not breach the contract by refusing to close because Pizzo's closing demand was not a valid "time is of the essence" demand. *Id.* at 164. The Bankruptcy Court held that Pizzo's conduct did not suggest that he viewed March 6, 2007 to be a "date of the essence." *Id.* at 163. Appellant argues that, even though the February 14, 2007 letter "did not expressly state that 'time was of the essence,' [it] set a specific closing date, effectively made time of the essence, invoked the provisions of paragraph 5 of the contract, exercised Pizzo's option to waive all preconditions to closing except title, and obligated Catanzareti to close on the sale of the Property to Pizzo by March 6, 2007." (Appellant's Br. at 29-30). Appellee argues that the letter failed to make time "of the essence,"

by failing to expressly refer to a time and place for closing and a price. The February 14, 2007 letter provides that Pizzo "will waive all of the preconditions except title and therefore is prepared to settle on the 6th day of March, 2007."

Under New Jersey law, the closing date in a contract for real property is presumed at equity to be a matter of formality instead of being "essential." *Marioni v. 94 Broadway, Inc.*, 374 N.J. Super. 588, 602-03 (N.J. Super. Ct. App. Div. 2005) (citing *Paradiso v. Mazejy*, 3 N.J. 110 (N.J. 1949)). If a contract expressly provides that time is of the essence, then a failure to perform on the date fixed will constitute a breach. *Id.* Where the initial agreement does not provide that time is of the essence, a party may still make time of the essence by a reasonable, formal demand. *Paradiso*, 3 N.J. at 115. The demanding party must also give "reasonable notice of the date for closing," and "the date chosen must bear a reasonable relation to the time already elapsed." *Id.* A demand's definitiveness and specificity may be considered when evaluating its reasonableness. *Marioni*, 374 N.J. Super at 603-04.

The Bankruptcy Court found that the February 14 letter "did not specify a time of closing, a place of closing, [or] any affirmative language that the closing must happen on March 6th, including 'time of the essence' language or otherwise." *Catanzareti*, 400 B.R. at 163. The Bankruptcy Court also found that a follow-up letter from Pizzo's attorney asked for a "convenient time on the date stated" or "a rescheduled date as soon as possible," and stated that "Pizzo's position in the second follow-up letter is inconsistent with a party requiring that time be of the essence . . . instead of taking the opportunity to lay down a clear, and unambiguous place and date for closing, Pizzo waffled with both date and time by asking Catanzareti for his input." *Id.* The February 14 letter and attendant follow-up letters show that Pizzo did not view March 6th

13

to be a closing date of the essence.  Therefore, the Court affirms the conclusions of the Bankruptcy Court.

> *2. Did the Bankruptcy Court erroneously rule that Catanzareti did not breach his obligations to Pizzo by refusing to convey the property and by failing to timely apprise Pizzo of the contemplated condemnation of the property?*

Appellant's second "issue presented" is whether the "Bankruptcy Court erroneously rule[d] that Plaintiff/Debtor/Appellee Catanzareti did not breach his obligations to Pizzo under the contract by refusing to convey the property to Pizzo and by failing to timely apprise Pizzo of the contemplated condemnation of the property." (Appellant's Br. at 2).  However, any briefing on this issue is completely absent from Appellant's moving papers.  This Court affirms the Bankruptcy Court's finding that paragraph 11 of the 2003 contract only provides that Catanzareti was to inform Pizzo of any formal proceeding or action under the Eminent Domain Act.

### III.   Conclusion

For the reasons stated, the opinion and order of the Bankruptcy Court is hereby AFFIRMED.  An appropriate form order is filed herewith.


Dated: October 20, 2009

                                              s/ Garrett E. Brown, Jr.
                                              GARRETT E. BROWN, JR., U.S.D.J.